IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| MONSTER DADDY, LLC | ) | Civil Action No.: 6:10-1170-MGL |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MONSTER CABLE PRODUCTS, INC., | ) | |
| MONSTER, LLC, and WEST COAST | ) | |
| CUSTOMS, INC., | ) | **OPINION AND ORDER** |
| | ) | |
| Defendants. | ) | |
| ——————————————— | ) | |
| | ) | |
| MONSTER CABLE PRODUCTS, INC., | ) | |
| | ) | |
| Counterclaimant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MONSTER DADDY, LLC | ) | |
| | ) | |
| Counterdefendant. | ) | |
| ——————————————— | ) | |

I.    **INTRODUCTION**

In this action, Plaintiff Monster Daddy, LLC ("Monster Daddy") asserts several causes of action against Defendants Monster Cable Products, Inc., Monster, LLC, and West Coast Customs, Inc. ("Monster Cable") stemming from Monster Cable's alleged breach of a settlement agreement ("2007 Settlement Agreement") entered between the parties on October 25, 2007. ( ECF No. 1.) Defendant Monster Cable Products, Inc. filed counterclaims seeking cancellation of Monster Daddy's old and new Monster registrations and alleging breach of the 2007 Settlement Agreement. (ECF No. 207.)

## II.      FACTUAL AND PROCEDURAL BACKGROUND

Monster Daddy brought its initial action against Monster Cable on May 7, 2010.  (ECF No.

1.)  Monster Daddy amended its complaint on November 28, 2011 ("amended complaint") to assert

seventeen counts generally based on breach of contract, trademark infringement, unfair competition,

and unfair trade practices.[1]  (ECF No. 193.)  After filing a motion to dismiss which was denied by

the court (ECF No. 226), Monster Cable answered the complaint on March 9, 2012, and filed

counterclaims directed to claims of breach of contract and declaratory relief, as well as claims

arising under the Federal Trademark Act of 1946, as amended, 15 U.S.C. § 1051, *et seq*. (the

"Lanham Act") and common law trademark right claims.  (ECF No. 207 at 71.)

Monster Daddy is a company engaged in the manufacture and sale of various industrial,

commercial, and household cleaners, waxes, and adhesives under the MONSTER trademark since

---

[1]Count I: Breach of Contract/ Unauthorized Trademark application for MONSTER GREEN
Count II:  Breach of Contract/ Unauthorized Foreign Trademark Applications
Count III: Breach of Contract/ Unauthorized use of MONSTER and MONSTER ENGINEERED AND MADE IN THE USA
Count IV: Breach of Contract/ Seeking to cancel US Registration No. 3,745,100
Count V: Breach of Contract/ Preventing Monster Daddy's Performance
Count VI: Declaratory Judgment That Monster Daddy Has Not Violated Lanham Act § 32, 15 U.S.C. § 1114-Trademark Infringement of a Registered Mark
Count VII: Declaratory Judgment That Monster Daddy Has Not Violated Lanham Act § 43(a); 15 U.S.C. § 1125(a)-Federal Unfair Competition
Count VIII: Trademark Infringement of a Registered Mark Lanham Act § 32, 15 U.S.C. § 1114)
Count IX: Federal Unfair Competition Lanham Act § 43(a), 15 U.S.C. § 1125(a)
Count X: South Carolina Unfair Trade Practices Act S.C. Code Ann. § 39-5-10, *et seq*.
Count XI: Common Law Unfair Competition
Count XII: Common Law Trademark Infringement
Count XIII: Injunctive Relief (In light of Monster Cable's breaches and failures to honor the Settlement Agreement)
Count XIV: Trademark Infringement of a Registered Mark- Lanham Act § 32, 15 U.S.C. § 1114
Count XV: Federal Unfair Competition Lanham Act § 43(a), 15 U.S.C. § 1125(a)
Count XVI: Equity and Unjust Enrichment
Count XVII: Breach of Contract (i.e., duty of good faith and fair dealing implied in every contract)

at least 1996. (ECF No. 193, ¶¶ 50-51.) Monster Cable began providing audio and video products as early as the 1970s. (ECF No. 195-1 at 3.) Monster Daddy and Monster Cable have been engaged in litigation for several years. In 2007, the parties resolved a previous action, *Monster Daddy LLC v. Monster Cable Products, Inc.*, CA No. 6:06-293-HMH, by entering into the 2007 Settlement Agreement. (ECF No. 195-4.) In that Settlement Agreement, Monster Cable agreed to recognize Monster Daddy's rights to the MONSTER trademark in connection with various types of products, including waxes and cleaners, along with other goods. (ECF No. 195-4 at 3-4.) Also granted to Monster Daddy was the right to extend its trademark into the natural zone of expansion for its various goods and services. (ECF No. 195-4 at 3-4.) In return, Monster Daddy expressly relinquished any claim it had to the MONSTER mark in connection with cleaners for consumer electronics and electronic accessories. (ECF No. 195-4 at 4.) In the instant action, Monster Daddy seeks to recover specific performance, damages, and declaratory and injunctive relief in order to protect Monster Daddy's "natural zone of expansion" into the use of compounds, cleaners, and similar products for the purpose of cleaning screens of various electronic devices. (ECF No. 193 at ¶ 161.)

Monster Cable's counterclaims relate to breach of contract and seeking cancellation of the MONSTER registration marks based on Monster Daddy's failure to abandon the old Monster registration and use of the MONSTER Mark without using MONSTER ENGINEERING more prominently. (ECF No. 218-1 at 17-20.) Monster Cable contends that there is no disputing Monster Daddy's failure to perform as directed by the 2007 Settlement Agreement's provisions.

On July 2, 2013, this court issued an opinion and order (ECF No. 305) granting in part and denying in part Monster Cable's Motion for Reconsideration (ECF No. 256); granting in part and

denying in part Monster Cable's Motion for Summary Judgment (ECF No. 218); and granting Monster Cable's Motion for Reconsideration (ECF No. 280). In the order, the court granted summary judgment in favor of Monster Cable on Monster Daddy's breach of contract (Counts 1-5, 17) and Screen Clean claims (Counts 13-16). Following the court's order, remaining for resolution are: 1) Monster Daddy's claims seeking a judicial declaration that Monster Daddy has not violated the Lanham Act by infringing any of Monster Cable's trademark rights and a declaration that Monster Daddy has not violated the Lanham Act through unfair competition and that it is further permitted to use and promote its goods by way of using the MONSTER DADDY mark (Counts 6-7), Monster Daddy's various federal trademark claims, Lanham Act claims, and state law claims related to Monster Cable's use of the marks MONSTER and MONSTER ENGINEERED AND MADE IN THE USA in connection with a line of car care products sold through Defendant West Coast Customs, Inc. ("West Coast Customs" claims) (Counts 8-12); and Monster Cable's counterclaims related to breach of contract and seeking cancellation of the MONSTER registration marks (Counterclaim Counts 1-3). The remaining matters were before the court to be tried exclusively to the court pursuant to its order of July 2, 2013 (ECF No. 305) and Monster Cable's waiver of its right to a jury trial on its counterclaims. (ECF No. 308.) On August 26-29, 2013 and September 16, 2013, this court held a bench trial and heard closing arguments from the parties. The court now issues these findings of fact and conclusions of law on all outstanding issues of law and fact in this action.[2]

---

[2] The parties do not dispute that this court has subject matter jurisdiction over the remaining counts of Monster Daddy's amended complaint and over Monster Cable's counterclaims. The court finds subject matter jurisdiction established pursuant to 28 U.S.C. §§ 1331, 1338(a), and 1367(a). Further, should a finding of fact constitute a conclusion of law, or vice versa, the court adopts it as such and directs that it should be treated accordingly.

III.     FINDINGS OF FACT

    A.     **Monster Daddy's Lanham Act Claims on the West Coast Customs Counts**

    Monster Daddy alleges that Monster Cable's use of the trademarks MONSTER and MONSTER ENGINEERED AND MADE IN THE USA in connection with Monster Cable's WEST COAST CUSTOMS BY MONSTER car care products are likely to cause consumer confusion. Monster Daddy further contents that it is entitled to damages as a result of Monster Cable's use of these trademarks which Monster Daddy contends amounts to trademark infringement and unfair competition in violation of the Lanham Act. Monster Cable denies the allegations of infringement and unfair competition and asserts that the use of the WEST COAST CUSTOMS BY MONSTER mark on car care products is not likely to cause confusion among consumers as to the true origins of the respective products.

**Evidence and Testimony Regarding Likelihood of Confusion**

1.     The parties presented evidence at trial as to the types of products offered by both Monster Daddy and Monster Cable.

2.     Monster Daddy presented the testimony of Mr. James Carter, CEO of Monster Daddy and related companies, who testified about producing certain one-part kits comprised of gallon-sized containers used to clean vehicles, often used in conjunction with a hand sprayer, and which contain a solution that can be diluted. (Tr. 44-46.) Mr. Carter also testified to having produced two-part kits comprised of a powder and a separate liquid product packaged in separate containers. (Tr. 47.) The two-part kit product was concentrated and had to be diluted. The product was used in more industrial settings and purchased for use in car lots, truck terminals, and shipyards to be used primarily in cleaning oxidation, dirt, grease, road film, and brake dust. (Tr. 47-48.) Mr. Carter

-5-

testified that he had been selling various kits of products which could be used to clean cars and other products in the 1990s and early 2000s, some of which carried a label bearing the word Monster.  (Tr. 49, 54-55, 228.)  Mr. Carter testified about a product called Transportation Truck Wash available in bulk tank form and used by a truck lift company to clean service trucks, forklifts, and engines (Tr. 67-68.)

3.      Mr. Carter also testified to selling certain industrial detergents, degreasers, concrete cleaners, vehicle washes, and several multi-gallon kits to Northern Tool and Equipment ("Northern Tool") to further be sold to consumers.  (Tr. 55-63.)  In particular, Mr. Carter offered testimony regarding a gallon-sized high foaming "vehicle wash" used to clean cars sold as a liquid in a plastic container similar to a "milk jug" or a "clorox bottle" with the word Monster on the package.  (Tr. 63, 67, 101.)  Mr. Carter discussed several Northern Tool invoices for a product called "Waxy Wash" also available in one gallon containers to be used on vehicles for waxing applications  (Tr. 85-86.) as well as a tractor and big rig cleaner for large trucks.  (Tr. 92-93.)  Several hundred Northern Tool purchase orders were admitted into evidence (Def.'s Exh. 79) which indicate distribution of various Monster Daddy cleaning products to Northern Tool to further be sold to individuals online or in store.  (Tr. 148-149.)  The invoices primarily indicate sales of liquid car care cleaning products to include Waxy Wash, Vehicle Wash, and Truck and Big Rig Wash from 2005 to 2011. (Tr. 155.)  Mr. Carter also testified about delivering a "Spray Wax" in or around 1998.  (Tr. 78.)

4.      Mr. Carter admitted that Northern Tool is geared toward the sale of home improvement and construction products but that it also sells automotive products.  (Tr. 251-252.)

5.      Mr. Carter testified that he did not think his customers would go into a Best Buy store looking for his products.  (Tr. 256.)

6.    Mr. Carter testified that his various products, including Spray Wax, House Wash, Vehicle Wash, and Brixx Wash, retailed from around $10 to around $16 dollars for a one-gallon product. (Tr. 274-275.)

7.    Monster Daddy put forth the testimony of Mr. Jeff Newman who was formerly employed by Mr. Carter who indicated the only point of similarity between the West Coast Customs products and Monster Daddy products he could identify would be a reference to Monster, Inc. on the label. (Tr. 422.)  He admitted that at his deposition he testified that he did not think that the West Coast Customs products looked like Monster Daddy products.  (Tr. 422.)

8.    Monster Cable presented the testimony of Vern Smith, an employee of Monster Cable working in product management and business development.  Mr. Smith testified as to the working and business relationship between West Coast Customs and Monster Cable (Tr. 509-510) as well as the intent of the product packaging and unique design elements of the West Coast Customs by Monster car care products.  (Tr. 511-512.)  Mr. Smith testified that the West Coast Customs products include various polishes, cleaners, applicators, and cloths to be used in the process of hand detailing personal vehicles.  (Tr. 514-515.)  Mr. Smith testified that the typical single 24-ounce bottle of the West Coast Customs car care products retails between $14.95 and $19.95.  (Tr. 516-517.)  The West Coast Customs products also come in the form of an entire kit for detailing cars to include various cloths, applicators, and cleaners, and to be sold at a retailer where CD players or speakers are sold, as well as specialty shops.  (Tr. 517.)  The entire West Coast Customs Car Care Kit (Plf.'s Exh. 17) is priced around $99.00.  (Tr. 517.)  Monster Cable targeted the sale of its West Coast Customs car care cleaning products to retail outfits such as Best Buy aimed toward individual consumers.  (Tr. 525; 546.)

9.      In March 2011, Monster Cable entered into a Manufacturing and Trademark License Agreement with West Coast Customs, Inc.  (Def.'s Exh. 168.)  Per the terms of that Agreement, Monster Cable licensed the right to use the trademark WEST COAST CUSTOMS on a line of car care products.  (Tr. 521.)  Monster Cable was required to pay a royalty to West Coast Customs for the right to use the trademark.  (Tr. 521-522.)  The stylized script scripting and presentation of the WEST COAST CUSTOMS mark used on the car care products is very similar to the marking used in association with the West Coast Customs television show.  (Tr. 508-509; Def.'s Exh. 248, 133.)  Mr. Smith testified that the purpose of placing the word Monster in small lettering under the WEST COAST CUSTOMS mark was to show that Monster Cable made the product under the WEST COAST CUSTOMS brand. (Tr. 509-510.)

10.     The parties' products were presented to the court through witness testimony.  Monster Daddy's cleaning products were packaged in large one or five gallon white jug containers or drums.  While Monster Daddy's product labeling varied significantly in some respects (i.e., Monster Green vs. Vehicle Wash), generally the word "Monster" is featured on the product label in standard block letters and the specific type of product i.e., Truck Wash is featured even more prominently on the side of the label and in bright neon colors. (Def.'s Exh. 270.)  On the other hand, Monster Cable's West Coast Customs products prominently feature the mark West Coast Customs in a graffiti-like font and the word Monster in a small ribbon and in small font underneath the more prominent West Coast Customs mark.  (Plf.'s Exh. 17; Def.'s Exh. 133.)  The Monster Cable product label is affixed to smaller, colorful, contoured, translucent plastic "spray" bottles.  (Tr. 653-655.)

### Evidence and Testimony Regarding Damages

1.      Mr. Carter offered testimony as to the nature of the recovery Monster Daddy seeks in this

action.  Other than attorney's fees (assuming the court finds that this is an exceptional case with willful infringement), Mr. Carter indicated that Monster Daddy seeks to recover Monster Cable's profits associated with Monster Cable's West Coast Customs car care cleaning line of products. (Tr. 164-166.)  Mr. Carter also indicated that Monster Daddy seeks treble damages.  (Tr. 166-167), injunctive relief to remove Monster Cable's West Coast Customs Products from the market (Tr. 168), and corrective advertising. (Tr. 168-169.)

2.      Monster Daddy put forth, by designation, the testimony of Tim Pryde, Director of Product Development and Product Management (Tr. 428) who offered minimal testimony as to profits and losses for the West Coast Customs car care cleaning line of products as well as some future projections as to the financial status of the products.  (Tr. 445.)  Monster Cable's finance manager Greg Olsen testified as to revenue and expenses incurred by Monster Cable associated with the sale of the West Coast Customs car care cleaning line of products.  Mr. Olsen testified extensively about profits and loss statements generated by the finance department on products and customers.  He testified about West Coast Customs car care products specifically and discussed financial reports that reflected a loss for the entire span of the West Coast Customs car care products' life. (Tr. 596.)

    B.      **Monster Daddy's Declaratory Judgment Claims**

Monster Daddy seeks a judgment from this court declaring that Monster Daddy's own use and registration of MONSTER DADDY does not violation trademark and unfair competition law. Monster Cable asserts that Monster Daddy is not entitled to prevail on its declaratory judgment claims on procedural grounds and furthermore denies that Monster Daddy has used and registered MONSTER DADDY in compliance with trademark and unfair competition law.  Monster Cable asks this court to find that there is no justiciable case or controversy raised as to the facts and issues

-9-

presented and further recommends this court find that the matters raised by Monster Daddy's declaratory judgment claims should be resolved by the Trademark Trial and Appeal Board ("TTAB") in a proceeding currently pending before that tribunal.

1.    On or around February 19, 2008, Monster Daddy filed an intent-to-use application to register the mark MONSTER DADDY in connection with several types of goods in various classes. (Def.'s Exh. 171.)

2.    Subsequently, Monster Cable initiated a proceeding in the United States Patent Office opposing the registration of MONSTER DADDY. (Tr. 699-700.) David Tognotti, Monster Cable's vice president of operations and general counsel, testified that Monster Cable initiated the proceedings because it deemed Monster Daddy's application for MONSTER DADDY to be in violation of the terms of the 2007 Settlement Agreement which required Monster Daddy to abandon a pending application for MONSTER DADDY. (Tr. 710-711.)

C.    **Monster Cable's Counterclaims Seeking Cancellation of Monster Daddy's Registrations**

Next, the court addresses Monster Cable's counterclaims related to breach of contract and seeking cancellation of Monster Daddy's trademark registrations, US Reg. No. 3353572, i.e., "Old Monster Registration," and US Reg. No. 3745100, i.e., "New Monster Registration." Cancellation is sought based on Monster Daddy's failure to abandon the old Monster registration as well as Monster Daddy's use of the MONSTER mark without using MONSTER ENGINEERING more prominently in violation of the 2007 Settlement Agreement. (ECF No. 218-1 at 17-20.) The 2007 Settlement Agreement allowed Monster Daddy to apply for a registration of the mark MONSTER ENGINEERING in a certain class of goods to include industrial and commercial adhesives,

chemical compositions, waxing, polishing and buffing compounds and various types of cleaners. (Def.'s Exh. 64, ¶ 1.)  On November 5, 2007, Monster Daddy filed an application with the United States Patent and Trademark Office to register the mark "MONSTER ENGINEERING." (Def.'s Exh. 172.)  The 2007 Settlement Agreement required Monster Daddy to "expressly abandon" several pending applications to register trademarks that contained the term "Monster" used in conjunction with other words  in accordance with time frame set forth in the agreement.  (Def.'s Exh. 64, ¶ 2.)  Having abandoned these applications, Monster Daddy was then to file a single trademark application for MONSTER (single word) for use in certain classes of goods which Monster Cable would not "oppose, seek to cancel or otherwise challenge."  (Def.'s Exh. 64, ¶ 3.)  At such time as the MONSTER application is "allowed in Class 003 or abandoned as to Class 003," Monster Daddy was to expressly abandon an older application for the mark MONSTER.  Monster Daddy also agreed that any use of MONSTER (single word) would be limited to a discrete placement and always in connection with a more prominent usage of the mark MONSTER ENGINEERING. (Def.'s Exh. 64, ¶ 3.) Monster Cable contends that there is no disputing Monster Daddy's failure to perform as directed by the Settlement Agreement's provisions.  Accordingly, Monster Cable seeks cancellation of both the Old Monster Registration and the New Monster Registration and further seeks injunctive relief preventing Monster Daddy from further use of MONSTER in contravention of the terms of the Settlement Agreement.

### Breach of Contract

1.      The Settlement Agreement at issue in this case provides as follows in pertinent part:

> 3. Monster Daddy will file a single trademark application for MONSTER (single word) limited to, at its discretion, IC 001, 003, 004, 005, and 016, which Monster Cable will not oppose, seek to

cancel or otherwise challenge. **At such time as the referenced application for MONSTER is allowed in Class 003 or abandoned as to Class 003, Monster Daddy will expressly abandon the pending application for MONSTER -Serial No. 78/694155, for which a notice of allowance has issued. Monster Daddy agrees that any use of MONSTER (single word) will be limited to a discrete placement and always in connection with a more prominent usage of the Mark.** (The mark "MONSTER" referred to in this paragraph shall not be construed as "the Mark" in this Agreement. )

(Def.'s Exh. 64, ¶ 3.)

### Cancellation of Old Monster Registration

1.     Mr. Carter admitted that he signed a settlement agreement between Monster Cable and Monster Daddy on behalf of Monster Daddy.  (Tr. 115.)  Mr. Carter further admitted that he was obligated pursuant to paragraph three of the 2007 Settlement Agreement to abandon an Old Monster Registration.   He testified that he has not complied with that portion of the 2007 Settlement Agreement because he feared a challenge to his New Monster Registration. (Tr. 122-123.)

2.     By its express terms, the 2007 Settlement Agreement does not prevent Monster Cable from seeking to cancel the Old Monster Registration.  The 2007 Settlement Agreement only precludes Monster Cable from opposing, seeking to cancel, or otherwise challenge the New Monster Registration.   (Def.'s Exh. 64, ¶ 3.)

3.     Monster Daddy contends that the "is allowed" event referenced in paragraph three of the 2007 Settlement Agreement (triggering Monster Daddy's need to expressly abandon its Old Monster Registration) occurred on December 30, 2009.  (Tr. 120.)  Monster Cable contends the "is allowed" date is an earlier point, January 13, 2009, when a Notice of Allowance was issued for the New Monster Registration. (Tr. 120.)

4.      There is no dispute between the parties that the Old Monster Registration has yet to be abandoned.  (Tr. 124.)

5.      The 2007 Settlement Agreement does not state whether the abandonment of the registration must be made with or without prejudice.

### Cancellation of New Monster Registration

1.      At trial, Mr. Carter testified that the mark Monster Engineering appeared more prominently than the word Monster on a container of Spray Wax (Def.'s Exh. 274) because the word Monster was accompanied by a "tail" and the words "Industrial Solutions."  (Tr. 237.)  Mr. Carter testified that his use of the word Monster on the container of Spray Wax is not a use of Monster (single word) but instead is a composite mark.  (Tr. 237-238.)  He indicated that the words Monster Engineering were on the back of the labels in small lettering.  (Tr. 245.)

2.      Mr. Tognotti testified that he has not seen any significant differences in the placement of marks and prominence of marks on Monster Daddy's labels after the 2007 Settlement Agreement. (Tr. 643-644.)

IV.  CONCLUSIONS OF LAW

      A.      **Monster Daddy's Lanham Act Claims on West Coast Customs Counts**

### Likelihood of Confusion

1.      Counts eight and nine of Monster Daddy's amended complaint allege federal unfair competition and trademark infringement violations under the Lanham Act § 43(a), 15 U.S.C. § 1125(a) and § 32, 15 U.S.C. § 1114.

The Lanham Act prohibits:

> (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . .

15 U.S.C. § 1114(1)(a).

Also prohibited is the:

> Use[] in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . .

15 U.S.C. § 1125(a)(1)(A).

2.    Counts eleven and twelve consist of South Carolina common law claims for unfair competition and common law trademark infringement respectively.  The elements of common law and unfair infringement under South Carolina law are identical to the elements for proving a Lanham Act claim.  *Shakespeare Co. v. Silstar Corp. of Am., Inc.*, 802 F.Supp. 1386, 1399 (D.S.C.1992), rev'd on other grounds by, 9 F.3d 1091 (4th Cir.1993) (noting that the elements of common law unfair competition and trademark infringement under South Carolina law are identical to the elements for proving a Lanham Act claim); *see also  Long Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*, 43 F.3d 922, 930 n. 10 (4th Cir.1995) ("The test for trademark infringement and unfair competition under the Lanham Act is essentially the same as that for common law unfair competition . . .").  Thus, Plaintiff's state law claims rise and fall with the federal claims.  *See generally Mazelmints, Inc. v. It's A Wrap, LLC*, No. 1:10–cv–1117, 2011 WL

-14-

2960873, *2 (E.D. Va. July 20, 2011).

3.      To prevail under a trademark infringement claim or an unfair competition claim, a plaintiff must prove: 1) that it possesses a mark; 2) that the defendant used the mark; 3) that the defendant's use of the mark occurred 'in commerce'; 4) that the defendant used the mark 'in connection with the sale, offering for sale, distribution, or advertising' of goods or services; and 5) that the defendant used the mark in a manner likely to confuse consumers.  *People for Ethical Treatment of Animals v. Doughney*, 263 F.3d 359, 364 (4th Cir. 2001) (citations omitted).

4.      A likelihood of confusion exists if "the defendant's actual practice is likely to produce confusion in the minds of consumers about the origin of the goods or services in question." *Carefirst of Md., Inc. v. First Care, P.C.*, 434 F.3d 263, 267 (4th Cir. 2006)(citation and internal quotation marks omitted).  In assessing whether such confusion exists, the court looks to " how the two parties actually use their marks in the marketplace to determine whether the defendant's use is likely to cause confusion." *Id.*

5.      The Fourth Circuit has articulated at least nine factors that are relevant to the "likelihood of confusion" inquiry: (1) the strength or distinctiveness of the plaintiff's mark as actually used in the marketplace; (2) the similarity of the two marks to consumers; (3) the similarity of the goods or services that the marks identify; (4) the similarity of the facilities used by the markholders; (5) the similarity of advertising used by the markholders; (6) the defendant's intent; (7) actual confusion; (8) the quality of the defendant's product; and (9) the sophistication of the consuming public.  *Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 153 (4th Cir. 2012).  Not all of these factors are of equal importance, "nor are they always relevant in any given case." *Anheuser–Busch, Inc. v. L & L Wings, Inc.*, 962 F.2d 316, 320 (4th Cir.1992).

-15-

6.      Evidence of actual confusion is "often paramount" in the likelihood of confusion analysis. *Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 804 (4th Cir.2001) ("When the plaintiff's mark is strong and the defendant's use of a similar mark 'has actually confused the public, our inquiry ends almost as soon as it begins.'")(internal citation omitted); *see also Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.,* 43 F.3d 922, 937 (4th Cir.1995) (noting that the actual confusion factor is "entitled to substantial weight as it provides the most compelling evidence of likelihood of confusion").   Actual confusion can be demonstrated by both anecdotal and survey evidence. *Tools USA and Equip. Co. v. Champ Frame Straightening Equip., Inc.*, 87 F.3d 654, 661 (4th Cir.1996).   Both types of evidence (i.e., anecdotal and survey evidence) are relevant, and neither category is necessarily required to prove actual confusion. *Id.*   Evidence of only a small number of instances of actual confusion may be dismissed as de minimis. *George & Co. LLC v. Imagination Entertainment Ltd.*, 575 F.3d 383, 398 (4th Cir. 2009).

7.      Plaintiff bears the burden of proving by a preponderance of the evidence that a likelihood of confusion exists. *David Sherman Corp. v. Heublein, Inc.*, 340 F.2d 377, 380 (8th Cir. 1965); *see also KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S.111, 121 (2004) ("[T]he burden of proving likelihood of confusion rests with the plaintiff . . . .").

8.      The fact finder is to address the factors in determining if a likelihood of confusion is present. *Rosetta Stone Ltd.*, 676 F.3d at 155.

9.      Without deciding the question of whether Monster Daddy is the true owner of the MONSTER mark, the court finds that Monster Daddy failed to prove a likelihood of confusion exists between the parties' marks in relation to the parties' products.   This is a critical element of Monster Daddy's trademark infringement and unfair competition claims.

-16-

10. The parties' respective products are different in that Monster Daddy's cleaning products are industrial and commercial in nature and can be used by industrial consumers to clean houses, forklifts and other heavy machinery, and automobile fleets, among other vehicles on a large scale and by way of broad application, i.e., hand-held sprayers. Monster Cable's products are targeted toward individual users in the consumer retail market for use on personal vehicles. Monster Cable's car care products are to be applied by hand using various cloths and applicators. Thus, the court concludes that the parties' products, intended markets, and consumers are different.

11. The court concludes that the appearance of the parties' marks is also different based on the overall look and labeling of the respective product packaging. Monster Daddy's product labels are affixed to large, white, multi-gallon containers highlighting Monster in bold lettering while Monster Cable's labels are on smaller, translucent bottles which feature the mark West Coast Customs in prominence.

12. There is no evidence in the record (at most only speculation) of any actual customer confusion between the West Coast Customs products and Monster Daddy products specifically. Evidence of actual confusion is "entitled to substantial weight." *Lone Star Steakhouse*, 43 F.3d at 937. Such evidence shows that customers are more than just *likely* to be confused by a defendant's use of a mark—evidence of actual confusion shows that customers are in fact actually confused. Posing questions to witnesses as to possible affiliations between products, even if they were relevant customers, does not create instances of actual confusion. *See Petro Stopping Centers v. James River Petr.*, 130 F.3d 88, 95 (4th Cir. 1997); *Nora Beverages, Inc. v. Perrier Group of America, Inc.*, 269 F.3d 114, 124 (2d Cir. 2001); *Fisher Stoves, Inc. v. All Nighter Stove Works, Inc.*, 626 F.2d 193, 195 (1st Cir. 1980). Without any evidence to the contrary, the court concludes

-17-

that there has been no actual confusion between the parties' marks as used on the parties' products.

13.    The court also concludes that Monster Daddy's MONSTER mark is commercially weak as the inquiry is relevant to the likelihood of confusion analysis. In evaluating the strength of a mark, it is useful to consider "two separate categories of the mark's strength: (i) conceptual strength: the placement of the mark along a spectrum focusing on the inherent potential distinctiveness of the term; and (ii) commercial strength: the marketplace's recognition as of the time the mark is asserted in litigation." *Renaissance Greeting Cards, Inc. v. Dollar Tree Stores, Inc.*, 405 F. Supp.2d 680, 690 (E.D. Va. 2005), aff'd, 227 F. App'x. 239, 242 (4th Cir. 2007); *George & Co.*, 575 F.3d at 393; *Wonder Works v. Cranium, Inc.*, 455 F. Supp. 2d 453, 458 (D.S.C. 2006).  Measuring a mark's conceptual or inherent strength focuses on the linguistic or graphical "peculiarity" of the mark, while the commercial strength prong of the inquiry "looks at the marketplace and asks if, in fact, a substantial number of present or prospective customers understand the designation when used in connection with a business to refer to a particular person or business enterprise." *Carefirst*, 434 F.3d at 269 (internal quotation and citation omitted).  In determining commercial strength, courts consider the six factors set forth in *Perini Corp. v. Perini Construction, Inc.*, which are "(1) advertising expenditures; (2) consumer studies linking the mark to a source; (3) sales success; (4) unsolicited media coverage of the product; (5) attempts to plagiarize the mark; and (6) the length and exclusivity of the mark's use." *Perini Corp. v. Perini Construction, Inc.*, 915 F.2d 121, 125 (4th Cir. 1990).

14.    Here, Monster Daddy presented no expert testimony supporting the strength of its mark. Monster Daddy did not identify any advertising expenditures related to industrial cleaning products (on behalf of itself or any related companies).  Monster Daddy did not conduct any consumer

studies or present any evidence of sales success or unsolicited media coverage of the industrial

cleaning products (on behalf of itself or any related companies).

15.     Instead, Monster Daddy's use of the Monster mark appears conceptually weak in that

Monster Daddy has used the word "Monster" as part of a number of other marks in connection with

its products but has done so in a fairly inconsistent manner and form in terms of presentation and

design. (*See* e.g., Def.'s Exhs. 133, 264, 266, 270.)  The lack of uniformity of uses and labeling

works against the very purpose of a trademark in providing an overall consistent appearance that

can be readily identified by the public.  *See e.g., Shelbyco Inc. v. Western Trimming Corp*., 43

U.S.P.Q.2d 1140, 1143, 1997 WL 377982 (D. Utah 1997) (Claiming trade dress in the overall look

of a line of 60 different products, plaintiff was unable to prove "that there is a consistent overall

look."); *Rose Art Industries, Inc. v. Swanson*, 235 F.3d 165, 171 (3d Cir. 2000) (Plaintiff must first

prove that its various types of products or packaging have a "consistent overall look" that

constitutes its alleged trade dress trademark.).

16.     The parties' testimony in this case indicates little similarity between the facilities used by

the respective parties in selling and distributing their products.  Mr. Carter's testimony on behalf

of Monster Daddy suggests that customers shopping for Monster Daddy's products would not go

to a location like Best Buy to look for Monster Daddy's products.  (Tr. 255-257.)  Monster Daddy's

products are sold primarily through Northern Tool; Monster Cable's products are sold primarily

through Best Buy.  (Tr. 55-56; 447.)  Although both parties' products are offered for sale on the

internet, "the mere fact that goods and services may be both advertised and offered through the

internet is not a sufficient basis to find that they are sold through the same channels of trade.  The

internet is such a pervasive medium that virtually everything is advertised and sold through the

Internet." *See Parfums de Coeur, Ltd. v. Lory Lazarus*, 83 U.S.P.Q. 2d 1012, 1021 (TTAB 2007). Accordingly, the court finds that the parties use different facilities to sell and distribute their products in the market.

17.     Monster Daddy did not establish that the parties' respective advertising is similar in any significant respect.  From the testimony in the record it appears that the Monster Cable product was advertised in conjunction with the West Coast Customs television show (Tr. 284), while Monster Daddy relies heavily on Northern Tool for online and promotional advertising (Tr. 149) and also attendance at trade shows. (Tr. 149-150.)

18.     Monster Daddy failed to show that the quality of Monster Cable's products or the sophistication of the parties' respective customers has any bearing on the likelihood of confusion. The court does not find these factors to be particularly relevant here.

19.     Monster Daddy offered very little evidence as to any intent to infringe by Monster Cable. "While proof of bad intent is not required for success in an infringement or unfair competition claim, the absence of such intent is a factor to be considered."  *Sensient Technologies Corp. v. SensoryEffects Flavor Co.*, 613 F.3d 754, 766 (8th Cir.2010).  Further, "[k]nowledge of another's product and an intent to compete with that product is not . . . equivalent to an intent by a new entrant to a market to mislead and to cause consumer confusion."  *Id.* (internal citation and quotation omitted).  The evidence in this case suggests an intent by Monster Cable to align itself with the West Coast Customs television show rather than an intent to create an association between Monster Daddy and Monster Cable's products.  (Tr. 658.)  Accordingly, the court does not find that Monster Cable intended to cause confusion in offering its West Coast Customs car care products.

20.     Finally, Monster Daddy provided no survey evidence or expert testimony to support its

allegations of likelihood of confusion.

21.    Based on the balance of the factors set forth above, the court finds that Monster Daddy failed

to prove a likelihood of confusion between the parties' respective marks.

### Damages/ Injunctive Relief

1.    Under the Lanham Act, a "plaintiff shall be entitled . . . subject to the principles of equity,

to recover: (1) the defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs

of the action. The court shall assess such profits and damages or cause the same to be assessed

under its direction." 15 U.S.C. § 1117(a).

2.    "A discretionary award of either damages or profits assumes an evidentiary basis on which

to rest such an award.  Without such a basis there can be no recovery." *Seidlemann Yachts, Inc. v.

Pace Yacht Corp.*,Civ. No. JH–87–3490. 1989 WL 214497, *19-20 (D. Md. 1989)(citing *Vuitton

et Fils, S.A. v. Crown Handbags*, 492 F.Supp. 1071, 1077 (S.D.N.Y.1979)).  Further, under the

Lanham Act, an award of profits is subject to the sound discretion of the court and is made subject

to the principles of equity.  *Id.*; *see also* 25 U.S.C. §1117.

3.    The principles of equity caution against an award of profits in this case, *see Synergistic Int'l,

LLC v. Korman*, 470 F.3d 162, 176 (4th Cir. 2006), but as an even more fundamental matter, there

is no evidence in the record of any profits made by Monster Cable in connection with the sale of

the West Coast Customs by Monster car care products.

4.    Monster Daddy's finance manager Greg Olsen testified extensively about profit and loss

statements generated by the finance department on products and customers.  He testified about West

Coast Customs car care products specifically.  The statement summaries and raw data reflect only

a modest sale of the Monster West Coast Customs products in 2011.  (Tr. 572.)(Def.'s Exh. 223A-

L.)  After deducting costs and expenses and accounting for other business adjustments, Monster Cable experienced a loss for the year 2011 associated with the West Coast Customs car care products.  (Tr. 592-593.)  Similarly, Mr. Olsen testified as to an overall financial loss for the year 2012 for the West Coast Customs car care products.  (Tr. 594.) (Def.'s 224A-224L.)  Additionally, Mr. Olsen testified to a loss for the year 2013 based on profit/loss statements through April (Def.'s Exh. 225A-225L) and a continued loss through July based on his knowledge of the relevant data. (Tr. 594-595.)  In sum, Monster Cable suffered a loss on the West Coast Customs product for all three years the product has been on the market.  (Tr. 597.)  Monster Daddy put forth no evidence or expert testimony challenging the calculation of profit, losses, business expenses, and the calculation and treatment of royalty payments assertions presented by Monster Cable on the point. Monster Daddy has made no allegations of any concrete figure it contends that Monster Cable has realized in terms of a profit for the West Coast Customs products.  On the other hand, Monster Cable has met its burden under 15 U.S.C. § 1117(a) of demonstrating and proving the elements of costs and deductions claims by presenting the court with detailed financial statements revealing that Monster Cable has suffered losses for the relevant time period as it relates to the West Coast Customs car care products.  Accordingly, Monster Daddy is not entitled to any monetary award of Monster Cable's profits where there is no evidence that Monster Cable made any profits.

5.     Further, Monster Daddy is not entitled to equitable relief in the form of an injunction preventing Monster Cable's further sale and distribution of the West Coast Customs car care products.  For a permanent injunction to issue, Monster Daddy must satisfy a four-factor test before a court may grant such relief.  Specifically, "[a] plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate

to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay, Inc. v. MercExchange, LLC*, 126 S.Ct. 1837, 1839 (2006). The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court. *Id.* Without a showing of actual confusion, or even likelihood of confusion, Monster Daddy simply has not established the injury prong of the four-factor test. Accordingly, Monster Daddy is not entitled to injunctive relief.

6.      Having found no violation on the part of Monster Cable, let alone a willful element, the court need not reach the inquiry as to whether this is an exceptional case warranting that Monster Cable pay attorneys' fees to Monster Daddy pursuant to 15 U.S.C. §1117.

### B.      Monster Daddy's Declaratory Judgment Claims

1.      A claim for declaratory judgment must present a justiciable case or controversy within the meaning of Article III of the United States Constitution. *See* 28 U.S.C. § 2201(a). The two pronged test for determining whether a case or controversy exists in a declaratory judgment action for trademarks requires a showing that: 1) the declaratory claimant has a real and reasonable apprehension of litigation; and 2) the claimant has engaged in a course of conduct which brought it into adversarial conflict with the declaratory defendant. *Healthnet, Inc. v. Health Net, Inc.*, No. 2:01–0835, 2003 WL 43375 (S.D.W.Va. Jan. 7, 2003); *see also Windsurfing Int'l, Inc. v. AMF, Inc.*, 828 F.2d 755, 757-758 (Fed.Cir.1987).

2.      Monster Daddy filed an intent-to-use application to register the mark MONSTER DADDY in connection with several goods in various classes. (Def.'s Exh. 171.) "The rights of an intent-to-use applicant are conditioned on registration. Although the owner of a mark may apply

for registration based on his intent to use the mark in the future, the mark is not registrable until it has actually been used in commerce and the applicant has filed a statement verifying such use." *Rosenruist-Gestao E Servicos LDA v. Virgin Enterprises Ltd.*, 511 F.3d 437, 440, n.1 (4th Cir. 2007) (citing 15 U.S.C.A. §§ 1051(b), (d)). The requirement reflects a fundamental trademark law principle that ownership rights flow from actual use of the mark in commerce. *Id.* (citing *Emergency One, Inc. v. American Fire Eagle Engine Co.*, 332 F.3d 264, 267 (4th Cir.2003)).

3.      Because no rights are conferred through the intent-to-use application, Monster Daddy as the declaratory claimant has not engaged in a course of conduct which would bring it into adversarial conflict with the declaratory defendant, Monster Cable, as required to satisfy the second prong of the two-pronged test for determining whether a case or controversy exists in a declaratory judgment action.

4.      On the trial record as it stands before this court, there is no evidence that Monster Cable has done anything more than initiate an opposition proceeding in the United States Patent and Trademark Office. *See HSI IP v. Champion Window Mfg. & Supply Co.*, 510 F.Supp.2d 948, 956 (M.D.Fla.2007) ( "While [Defendant] is correct that the filing of a TTAB action is not, on its own, sufficient to create an actual controversy, such is not the issue in this case where it is undisputed that in addition to filing an opposition in the TTAB proceedings, [Defendant] sent correspondence to [Plaintiff] suggesting it would sue if its [infringement] concerns 'could not be settled on an amicable basis.'"). Thus, Monster Daddy, the declaratory claimant, has no real and reasonable apprehension of litigation needed to satisfy the first prong of the two-part analysis.

5.      Monster Daddy cannot seek to use the declaratory judgment procedure to bypass the administrative process, particularly where the applicant has not even used the mark at issue.

-24-

*Homemakers, Inc. v. Chicago Home for the Friendless*, 169 U.S.P.Q. 262, 263, 1971 WL 16689 (7th Cir. 1971), cert. denied, 404 U.S. 831(1971) (cancellation proceeding against the plaintiff); *Wham-O, Inc. v. Manley Toys, Ltd.*, 92 U.S.P.Q.2d 1750, 2009 WL 6361387 (C.D. Cal. 2009) (No sufficient case or controversy between the parties to warrant declaratory relief where there was no use by defendant of the marks and no threat by plaintiff of infringement and noting that defendant initiated the proceedings before the TTAB could determine the validity of the marks).

6.      Accordingly, this court declines to issue a judicial declaration finding that Monster Daddy's efforts to register the mark MONSTER DADDY is in compliance with applicable trademark and unfair competition law.

C.      **Monster Cable's Counterclaims Seeking Cancellation of Monster Daddy's Registrations**

1.      Under the Lanham Act, district courts have the power to cancel registrations: "[i]n any action involving a registered mark the court may determine the right to registration, order the cancellation of registrations, in whole or in part, restore canceled registrations, and otherwise rectify the register with respect to the registrations of any party to the action . . . ." 15 U.S.C. § 1119.

2.      Pursuant to 15 U.S.C. § 1119, district courts have concurrent jurisdiction with the United States Patent and Trademark Office to order the cancellation of federal trademark registrations. *Shakespeare Co. v. Silstar Corp. of America, Inc.*, 9 F.3d 1091, 1092 (4th Cir. 1993)("Congress adopted 15 U.S.C. § 1119 to give the district court power concurrent with, but not in excess of, the Patent and Trademark Review Board . . . .").

3.      The party seeking cancellation must prove two elements: (1) that it has standing; and (2) that there are valid grounds for cancelling the registration. *Cunningham v. Laser Golf Corp.*, 222 F.3d

943, 945 (Fed. Cir. 2000). Monster Cable's standing has been adequately established by way of the 2007 Settlement Agreement, which provides evidence of Monster Cable's real interest in this proceeding. *See Jewelers Vigilance Committee Inc. v. Ullenberg Corp.*, 823 F.2d (Fed. Cir. 1987). "[I]n a [trademark registration] cancellation for abandonment, as for any other ground, the petitioner bears the burden of proof. Moreover, the petitioner's burden is to establish the case for cancellation by a preponderance of the evidence." *Cerveceria Centroamericana, S.A. v. Cerveceria India, Inc.*, 892 F.2d 1021, 1023 (Fed.Cir.1989).

4.      In this instance, any ground that would have prevented registration in the first place qualifies as a valid ground for cancellation. *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 946 (Fed. Cir. 2000). A promise not to register a mark pursuant to a contract, such as a settlement agreement, is a proper ground for barring registration. *See Vaughn Russell Candy Co. v. Cookies in Bloom Inc.*, 47 U.S.P.Q.2d 1635 (TTAB 1998). Further, a registration can be canceled at any time if the registered mark has been "abandoned." 15 U.S.C.A. § 1064(3).

5.      As both parties acknowledged, the 2007 Settlement Agreement can best be classified as a "consent-to-use agreement" which aims to fix and define the existing trademarks of each party so that confusion and infringement may be prevented. *See generally Brennan's Inc. v. Dickie Brennan & Co., Inc.*, 376 F.3d356, 364 (5th Cir. 2004). The provisions of the 2007 Settlement Agreement evidence the parties' intent that Monster Daddy's primary and most prominent mark is to be MONSTER ENGINEERING on specified goods; that Monster Daddy was to abandon the majority of its other "Monster" applications; that Monster Daddy would have a single registration for MONSTER as a single word; and that Monster Cable would not contest, oppose, or seek to otherwise challenge Monster Daddy's efforts to file a new single trademark application for

-26-

MONSTER (single word) limited to a certain class of goods.

6.      Specifically, and as relevant here, Paragraph three of the Settlement Agreement required Monster Daddy to abandon an older pending application for MONSTER, associated with the Old Monster Registration, once a notice of allowance was issued allowing for a New Monster Registration.

7.      Although the parties dispute the exact date of allowance for the New Monster Registration, it is undisputed that any such date has past and it is further undisputed that Monster Daddy has yet to abandon the Old Monster Registration despite an understanding of the obligations imposed upon Monster Daddy under the 2007 Settlement Agreement. (Tr. 115, 124.)

8.      District courts have the power to enforce settlement agreements requiring that an applicant abandon its trademark application. *See Metro-Goldwyn Mayer, Inc. v. 007 Safety Products, Inc.*, 183 F.3d 10, 15 (1st Cir. 1999) (Court upheld permanent injunction against applicant seeking to withdraw abandonment of application, which was contrary to settlement agreement).

9.      The Settlement Agreement specifies that South Carolina law applies as the governing and applicable law.  (Def.'s Exh. 64, ¶ 12.8.)  A settlement agreement is a type of contract.  *See generally United States v. ITT Continental Banking Co.*, 420 U.S. 223 (1975).  Under South Carolina law, "[a] contract is an obligation which arises from actual agreement of the parties manifested by words, oral or written or by conduct." *Roberts v. Gaskins*, 327 S.C. 478, 486 S.E.2d 771, 773 (S.C. Ct. App. 1997).  Under South Carolina law, to recover for a breach of contract, Monster Cable must prove: (1) a binding contract entered into by the parties; (2) a breach or unjustifiable failure to perform the contract; and (3) damage suffered as a direct and proximate result of the breach.  *Fung Lin Wah Enterprises Ltd. v. East Bay Import Co.*, 465 F.Supp.2d 536,

542 (D.S.C. 2006). Having agreed to abandon the Old Monster Registration and failing to do so constitutes a breach of contract. Consequently, Monster Daddy cannot, after having entered into a settlement agreeing to abandon a particular registration, maintain that it is entitled to use the mark for which registration is sought. *See Vaughn Russell Candy Co. v. Cookies in Bloom Inc.*, 47 U.S.P.Q.2d 1635, 1637 (TTAB 1998).

10.     The Settlement Agreement never foreclosed Monster Cable from seeking to cancel the Old Monster Registration. (Def.'s Exh. 64, ¶ 3.) Any efforts on the part of Monster Cable to seek the cancellation of the Old Monster Registration as contemplated by the 2007 Settlement Agreement do not excuse Monster Daddy's nonperformance or alter Monster Daddy's obligations under the settlement agreement.

11.     The court concludes that Monster Daddy materially breached the 2007 Settlement Agreement by failing to abandon the Old Monster Registration in accordance with the terms of the Settlement Agreement. Monster Daddy failed to maintain a single trademark registration, and now has two registrations for the mark MONSTER. Monster Daddy's breach of the 2007 Settlement Agreement is a proper ground for cancelling the Old Monster Mark with prejudice. At this juncture, only cancellation of the Old Monster Registration would accomplish the parties' intent and harmonize the provisions of the agreement as a whole. *Wells Cargo, Inc. v. Wells Cargo, Inc.*, 606 F.2d 961, 964 (C.C.P.A. 1979) (withdrawal of first application "with prejudice" equitably estops applicant and its successors from seeking registration again).

12.     Further, and as it specifically relates to Monster Cable's counterclaim seeking cancellation of the New Monster Registration, pursuant to the 2007 Settlement Agreement, Monster Daddy agreed that any use of the word Monster (single word) would be limited to a discrete placement and

-28-

always in connection with a more prominent usage of the mark MONSTER ENGINEERING. (Def.'s Exh. 64, ¶ 3.)  Monster Daddy contends that its use of the word Monster on its bottle of Spray Wash, for example, is in fact a composite mark to be viewed in conjunction with other words and design elements.  (Tr. 238.)  Monster Daddy, however, did not put forth any expert testimony to describe and classify the combination of terms as a composite mark in support of its theory.

13.     Monster Daddy agreed to always use the single word Monster in connection with a more prominent usage of the mark MONSTER ENGINEERING to be further limited to a discrete placement.  Monster Daddy's own testimony in this case indicates non-compliance.  *See L.C. Licensing, Inc. v. Cary Berman*, 86 USPQ2d 1883, 1887, 2008 WL 835278, at *3 (TTAB 2008) ("[I]t is well settled that if a mark comprises both a word and a design, then the word is normally accorded greater weight because it would be used by purchasers to request the goods."). For example, on Monster Daddy's container of Spray Wax, the large-bold letter word "Monster" is neither discretely placed, nor has it been used in connection with the mark MONSTER ENGINEERING although there is a suggestion by Monster Daddy that the word "Monster" is to be read in conjunction with "Industrial Solutions" which follows on a second line in a much smaller and fainter size and color.  MONSTER ENGINEERING appears in very small lettering on the back of the container.

14.     Monster Daddy has failed to use MONSTER in the manner proscribed and contemplated by the Settlement Agreement.  Such nonconforming use constituted an abandonment, and estops Monster Daddy from asserting any priority in the single word MONSTER.  *Hamilton Brown Shoe Co. v. Sam B. Wolf Sons Co.*, 39 F.2d 272, 274 (CCPA 1930) (shoe manufacturer's agreement to restrict use of mark "American Lady" by always using it along with other words limited the

-29-

manufacturer's right to use of mark and precluded registration of said mark unaccompanied by the other words required by agreement).

15.     The court concludes that because Monster Daddy failed to use MONSTER in compliance with the terms of the 2007 Settlement Agreement, it effectively abandoned the mark. Abandonment is grounds for cancellation of the mark; accordingly, the court orders the cancellation of the New Monster Registration.

V.     CONCLUSION

For the foregoing reasons, the court concludes as follows:

1.  Judgment is entered against Monster Daddy on its West Coast Customs claims. The court finds that Monster Daddy did not meet its burden of proving likelihood of confusion or damages and therefore dismisses the trademark infringement and unfair trade practices act claims brought pursuant to state and federal law.

2.  Monster Cable's request that this court cancel Monster Daddy's Old and New Monster Registrations is granted. Judgment is entered in favor of Monster Cable on its counterclaims; the court hereby orders the cancellation of the Old Monster Registration (US Reg. No. 3353572) with prejudice and cancellation of the New Monster Registration (US Reg. No. 3745100) without prejudice. The Clerk shall certify this order to the Commissioner for entry upon the records of the United States Patent and Trademark Office.

3.  The court declines to enter a declaratory judgment with regard to the MONSTER DADDY registration and mark as the matter is pending before the United States Patent and Trademark Office and there is no case or controversy ripe for this court's further consideration.

4. The court will consider any pending and forthcoming motions for attorneys' fees and costs as post-trial matters.  Monster Cable's Motion for Default Judgment as to Monster Daddy's Claims (ECF No. 345) is denied as moot as a result of this order resolving the parties' claims on the merits.  Any relief not expressly awarded in this order is hereby denied.

IT IS SO ORDERED.


                                        /s/Mary G. Lewis
                                        United States District Judge

September 30, 2013
Spartanburg, South Carolina